UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| RORY DAMES, | ) |
| | ) |
| Plaintiff, | ) No. 1:25-CV-03503 |
| | ) |
| v. | ) |
| | ) Judge Edmond E. Chang |
| U.S. CENTER FOR SAFESPORT, | ) |
| | ) |
| Defendant. | ) |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Rory Dames was suspended from coaching for the Chicago Red Stars by the United States Soccer Federation after an investigation into his eligibility as a coach was opened by the United States Center for SafeSport. Dames brought this lawsuit against the Center to challenge its authority and the procedures used to investigate the various allegations against him. R. 1, Compl.[1] He alleges that the policies employed by the Center in its adjudicative process violate the Ted Stevens Amateur Sports Act, the SafeSport Act, and Illinois common law. He seeks an injunction barring the Center from investigating him. The Center opposes Dames' request for a preliminary injunction and moves to dismiss the case for lack of subject matter jurisdiction. R. 15, Def.'s Mot. For the reasons discussed below, the Center's motion to dismiss is granted, though not on jurisdictional grounds. The dismissal is without

---

[1]Citations to the record are "R." followed by the docket entry number and, if needed, a page or paragraph number. This Court has jurisdiction over this matter because it is a civil action brought in the Illinois state court against the Center and is therefore removable to the district court under the SafeSport Act, 36 U.S.C. § 220541(d)(3)(A).

prejudice to filing an amended complaint if Dames thinks that he can fix the deficiencies described in this opinion.

## I. Background

The allegations underlying this lawsuit are drawn from the Complaint and its attached exhibits. *See generally* Compl. In deciding a motion to dismiss, the Court accepts well-pleaded facts as true and draws all reasonable inferences in the plaintiff's favor. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Erickson v. Pardus*, 551 U.S. 89, 94 (2007).

### A. The Statutory Framework

This case requires (figuratively) opening the U.S. Code book to Title 36, entitled Patriotic and National Observances, Ceremonies, and Organizations. Under the Amateur Sports Act, 36 U.S.C. § 220501, *et seq.*, the United States Olympic and Paralympic Committee[2] is charged with certifying a "national governing body" for each sport that is included in the Olympic and Paralympic Games. *See* 36 U.S.C. §§ 220501(b)(7), 220521(a)(1). The purpose of the governing bodies is, among other things, to govern participation in athletic competitions for their specific sports, including determining eligibility standards for coaches and athletes. *Id.* § 220523(a). The U.S. Soccer Federation (the parties use "USSF" to refer to the Federation) is the

---

[2]To avoid an acronym-laden opinion as much as practicable, this opinion will refer to the Committee as the Olympic Committee, but only for clarity's sake and not to diminish the importance or skill of paralympic athletes. *Compare* 2016 Paralympic Games, 1,500-meter (T13 visual impairment) men's track gold-medal result (00:03:48.290) (available at https://www.paralympic.org/rio-2016/results/athletics/mens-1500-m-t13) *with* 2016 Olympic Games, 1,500-meter men's track gold-medal result (00:03:50.000) (available at olympics.com/en/olympic-games/rio-2016/results/athletics/1500m-men).

2

certified governing body for (not surprisingly) soccer. Compl. ¶ 19. The USSF thus has discretion over the issuance of coaching licenses. *Id.* ¶ 20. Historically, the governing bodies of each sport were the primary handlers of allegations of misconduct amongst their members, so the USSF established bylaws to govern proceedings to address misconduct allegations. *Id.* ¶ 23; R. 1, Exh. E, USSF Bylaws.

In 2018, Congress passed the SafeSport Act to designate the Center as the "independent national safe sport organization" for the United States. 36 U.S.C. § 220541(a)(1)(A). Under the SafeSport Act, the Center's duties include maintaining an office for investigating and resolving allegations of abuse committed against athletes. *Id.* § 220541(a)(1)(D); Compl. ¶ 12. The Center exercises jurisdiction over the Olympic Committee and each national governing body to safeguard amateur athletes against abuse. 36 U.S.C. § 220541(a)(1)(B); Compl. ¶ 10. Pursuant to its duties, the Center developed a Code of Conduct that outlines behaviors constituting an abusive act. *Id.* ¶ 8; R. 15-1, Exh. A, SafeSport Code, Article IX (Prohibited Conduct). The SafeSport Act requires that the Center's investigations comport with due process, "including, at a minimum," written notice of allegations against the subjects of the investigation, the right to counsel or another advisor, the opportunity to be heard during the investigation, a written reasoned decision if a violation is found, and the ability to challenge any sanctions imposed as a result. 36 U.S.C. § 220541(a)(1)(H). The Act also permits the Center to use a "neutral arbitration body" to determine eligibility, § 220541(c)(1), and the Center indeed has established an arbitration process, SafeSport Code, Article XIV (Arbitration Rules). In light of the Center's designation

3

and authority under the SafeSport Act, the Center can investigate and sanction coaches, which in turn causes national governing bodies to revoke or suspend the licenses of coaches. *See* Compl. ¶ 18; SafeSport Code, Article XIII.A (Sanctions); USSF Bylaw 708 (establishing the Center's jurisdiction over members of USSF for allegations of abuse or misconduct). The Act also expressly says that nothing in it "shall be construed … to give rise to a claim under State law or to create a private right of action." 36 U.S.C. § 220541(a)(2)(C).

### B. Factual Background

Rory Dames has been a soccer coach for some 30 years. Compl. ¶ 2. In 2011, Dames became the coach of the Chicago Red Stars, a professional women's soccer team. *Id.* To work as a professional coach, Dames had to be licensed by the USSF; he obtained that license in 2010. *Id.* ¶ 21. But in January 2022, the USSF suspended his license. *Id.* ¶ 41. One month later, the SafeSport Center sent Dames a Notice of Allegations stating that the Center was investigating allegations of misconduct from 1998 and 2020. R. 5-1, Exh. A, Feb. 2022 Notice at 1. The Notice also said that the USSF's suspension of Dames' license was lifted, though subject to requirements (including that an adult chaperone be present when Dames was coaching). *Id.* at 2–3. The Notice went on to say that Dames could request a hearing to challenge the temporary sanctions—but Dames did not do so. *Id.* at 3; *see also* R. 17-1, Pl.'s Reply at 11–14 (acknowledging the chance to request a hearing but arguing that any challenge to the Center's ability to impose these sanctions would have been futile). Pursuant to the Center's procedures, the Center posted Dames' sanctions on SafeSport's disciplinary

4

database. Compl. ¶ 46. Despite the Center's lift of the license suspension, the USSF did not reinstate Dames' license. *Id.* ¶ 47.

Fast forward almost three years later: in January 2025, the Center issued an updated Notice of Allegations (updated in the sense that amended the 2022 notice). *Id.* ¶ 57; R. 5-2, Exh. B, Jan. 2025 Notice. This time, the Center stated that it had received allegations of misconduct as to nine minor athletes and one adult athlete. Jan. 2025 Notice at 2–5. The allegations described emotional and physical misconduct that spanned from 1993 to 2018. Compl. ¶ 57. Moving from alleged facts to applicable standards, the Notice also said that the Center makes violation determinations using "previous standards promulgated by USSF and then-applicable existing community standards analogous to the 2021 [Center] Code, which was the Code in effect when the Center received the initial Incident Report regarding the misconduct." Jan. 2025 Notice at 5. For the vast majority of the allegations, the Notice acknowledged that the Center had been "unable to locate a policy which could apply to these allegations," but reserved the right to identify policy violations during the course of its proceedings. Compl. ¶ 58 (quoting Jan. 2025 Notice at 2–5).

The Notice informed Dames that the next step would be for a Center investigator to interview him so that he might "explain [his] side of the situation, provide any information [he] may have in response to the allegations, offer names of any relevant witnesses, and to ask any questions." Jan. 2025 Notice at 5. The Notice informed Dames that he had the right to an advisor "[t]hroughout the Response & Resolution Process." *Id.* at 6. Finally, the Notice specified that Dames (and the claimant)

5

would have two weeks to review the Center's evidence and then provide a written response with relevant supplemental information pertaining to the allegations. *Id.*

In February 2025, Dames received a second Notice of Allegations from the Center[3]. Compl. ¶ 64; R. 5-3, Exh. D, Feb. 2025 Notice. This Notice set forth allegations of sexual misconduct, from around 2001 or 2002, between Dames and an adult athlete whom he coached during that time. Feb. 2025 Notice at 2. Like the January 2025 Notice, it reiterated that Dames had a right to an advisor during the process and that he would have an opportunity to review and respond to the allegations. *Id.* at 2.

In March 2025, the Center provided Dames with a 48-page statement of allegations in connection with the February Notice, requesting that Dames respond to the allegations within 14 days. Compl. ¶ 71. One week later, the Center provided Dames with 816 pages of information as to the January Notice, again requesting that he respond within 14 days. *Id.* ¶ 72. But Dames did not respond to either request; instead, he sued the Center in Cook County Circuit Court seeking an injunction barring the Center from moving forward with the investigation and asking for a declaratory judgment that the Center has exceeded its authority, violated his "due process" rights under the SafeSport Act, and violated its own Code of Conduct. *See generally* Compl.

---

[3]As a reminder, the prior notice sent in January 2025 was an amendment to the notice from 2022, so the February 2025 notice is properly considered as the second operative notice from the Center.

In particular, the three-count complaint asserts a claim for the alleged violation of his "fundamental rights", *id.* ¶¶ 80–86; a claim for tortious interference with his rights under the USSF bylaws, *id.* ¶¶ 87–91; and a claim for tortious interference with his prospective business opportunities, *id.* ¶¶ 92–95. The Center removed the action to federal court under the SafeSport Act. *See* R. 1, Notice of Removal (citing 36 U.S.C. § 220541(d)(3)(A)). After the removal, the Center agreed to stay the deadlines for Dames' response to the allegations in the January and February Notices for 45 days. R. 8, Minute Entry of 04/03/25. The Center has now responded to the motion for preliminary injunction and moved to dismiss the case. Def.'s Mot.

## II. Legal Standard

A Rule 12(b)(1) motion tests whether the Court has subject matter jurisdiction, *Hallinan v. Fraternal Ord. of Police of Chi. Lodge No. 7*, 570 F.3d 811, 820 (7th Cir. 2009); *Long v. ShoreBank Dev. Corp.*, 182 F.3d 548, 554 (7th Cir. 1999), whereas a Rule 12(b)(6) motion tests the sufficiency of the complaint, *Hallinan*, 570 F.3d at 820; *Gibson v. City of Chi.*, 910 F.2d 1510, 1520 (7th Cir. 1990). In order to survive a Rule 12(b)(1) motion, the petitioner must establish that the district court has subject matter jurisdiction. *United Phosphorous, Ltd. v. Angus Chem. Co.*, 322 F.3d 942, 946 (7th Cir. 2011), *overruled on other grounds*, *Minn-Chem, Inc. v. Agrium, Inc.*, 683 F.3d 845 (7th Cir. 2012). "If subject matter jurisdiction is not evident on the face of the complaint, [then] the ... Rule 12(b)(1) [motion is] analyzed [like] any other motion to dismiss, by assuming for the purposes of the motion that the allegations in the complaint are true." *Id.*

The Center moves to dismiss Dames' claim under Rule 12(b)(1), asserting that this Court lacks jurisdiction to hear the case because it is "pre-empted" by the statutory scheme at issue. Def.'s Mot. at 8–10. But as explained in more detail below, the proper procedural vehicle for the Center's preemption argument is a motion to dismiss for failure to adequately state a claim under Rule 12(b)(6). "A motion under Rule 12(b)(6) challenges the sufficiency of the complaint to state a claim upon which relief may be granted." *Hallinan*, 570 F.3d at 820. "[A] complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Iqbal*, 556 U.S. at 678 (cleaned up).[4] These allegations "must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). The allegations that are entitled to the assumption of truth are those that are factual, rather than mere legal conclusions. *Iqbal*, 556 U.S. at 678–79.

### III. Analysis

### A. Jurisdiction versus Preemption

Before addressing the merits of the preemption debate, there is a threshold question: is this jurisdictional or not? As noted before, the Center contends that federal courts lack subject matter jurisdiction to hear Dames' claims. *See* Def.'s Mot. at 8–10. The foundation for this contention is that a coach's challenge to the Center's determination of eligibility is "preempted" by the Amateur Sports Act. *Id.* at 8–9.

---

[4]This opinion uses (cleaned up) to indicate that internal quotation marks, alterations, and citations have been omitted from quotations. *See* Jack Metzler, *Cleaning Up Quotations*, 18 Journal of Appellate Practice and Process 143 (2017).

Although the Court ultimately agrees that the claims are indeed barred by the Act, the problem is not a lack of subject matter jurisdiction.

Over two decades ago, the Supreme Court launched an effort to clearly distinguish between truly jurisdictional defects versus all other types of defects. "Clarity would be facilitated if courts and litigants used the label 'jurisdictional' not for claim-processing rules, but only for prescriptions delineating the classes of cases (subject-matter jurisdiction) and the persons (personal jurisdiction) falling within a court's adjudicatory authority." *Kontrick v. Ryan*, 540 U.S. 443, 455 (2004). Here, the SafeSport Act itself confers jurisdiction on federal district courts to receive removals of state court cases filed against the Center "relating to" its statutorily conferred responsibilities:

> Any civil action brought in a State court against the Center *relating to the responsibilities* of the Center under this section, section 220542, or section 220543, shall be removed, on request by the Center, to the district court …, and such district court shall have *original jurisdiction* over the action without regard to the amount in controversy or the citizenship of the parties involved.

§ 220541(d)(3)(A) (emphases added). The statute explicitly grants "original jurisdiction"—without the need to invoke diversity jurisdiction—over precisely the type of case brought by Dames: a state court action "relating to the responsibilities" of the Center. *Id.* Indeed, the Center relied on this jurisdictional provision in filing the notice of removal. Notice of Removal.

The Court is mindful that the Seventh Circuit, in *Slaney v. International Amateur Athletic Federation*, 244 F.3d 580, 594–96 (7th Cir. 2001), characterized the

9

preemption issue as a jurisdictional one in a case involving the Amateur Sports Act—but the SafeSport Act had not been enacted yet, let alone discussed. *Slaney* considered an athlete's challenge to the Olympic Committee's ineligibility finding against her. *Id.* at 586–87. The Seventh Circuit held that the athlete could not bring the case because "when it comes to challenging the eligibility determination of the USOC, only a very specific claim will avoid the impediment to *subject matter jurisdiction*" posed by the Amateur Sports Act. *Id.* at 595 (emphasis added). *Slaney* explicitly affirmed the dismissal of the athlete's claim on the ground that the district court "lacked subject matter jurisdiction …." *Id.* at 596.

If *Slaney* were directly on point, then this Court would still be bound by the Seventh Circuit's characterization of the preemption issue as jurisdictional. But *Slaney* addressed the Amateur Sports Act, not the SafeSport Act. *Slaney* also predated the Supreme Court's instruction in *Kontrick* to avoid classifying flaws on the merits as jurisdictional defects. The Seventh Circuit has since repeatedly recognized *Kontrick*'s admonition. *E.g.*, *Adkins v. VIM Recycling, Inc.*, 644 F.3d 483, 491–92 (7th Cir. 2011) (explaining that a statutory bar against citizen-suits under a federal environmental statute after a State had already commenced an action was a claim-processing rule, not a jurisdictional one). "Jurisdiction means nothing more and nothing less than a court's adjudicatory authority," and courts should not expand jurisdictional rules "without explicit indications from Congress that it intended such drastic results." *Id.* at 491–92 (cleaned up). Given the SafeSport Act's explicit grant of

10

jurisdiction over this case, 36 U.S.C. § 220541(d)(3)(A), the Court will treat preemption as a dispute on the merits, evaluated under Civil Rule 12(b)(6).

## B. Preemption

The Center argues that it is "well settled" that challenges to eligibility determinations are preempted by the SafeSport Act because Congress "vested such processes and decisions solely with the Center" and the national governing bodies to be handled through arbitration. Def.'s Mot. at 9. According to the Center, Dames' suit is really just a disagreement with the methods used by the Center to determine his coaching eligibility, so the Act disallows a federal court (or any court) to adjudicate this dispute. *Id.* at 10. In response, Dames argues that his claims fall within an exception to the general bar against eligibility determinations, namely, for claims that the Center has violated its own internal policies; he also adds that his claim for denial of due process under the SafeSport Act would not be cognizable in the arbitration. Pl.'s Reply at 6–15.

The few cases to speak on this issue hold that, generally speaking, the Amateur Sports Act and its related amendments in the SafeSport Act do preempt claims challenging an eligibility determination made by a governing body or by the Center itself. *See Navarro v. United States Ctr. for SafeSport*, 2025 WL 209166, at *8 (W.D. Va. Jan. 15, 2025) (collecting cases). The starting point is statutory text: one purpose of the Olympic Committee is "to exercise exclusive jurisdiction … over all matters pertaining to United States participation in the Olympic Games …." 36 U.S.C. § 220503(3); *Slaney*, 244 F.3d at 594 (citing statute). The Amateur Sports Act also

11

lists the "swift resolution of conflicts and disputes involving amateur athletes, national governing bodies, and amateur sports organizations" as a purpose of the Olympic Committee. 36 U.S.C. § 220503(8). Beyond statutory text is a telling silence: there is no private right of action created by the Amateur Sports Act. *Slaney*, 244 F.3d at 594. So "strict questions of athletes' eligibility are preempted by the Amateur Sports Act's grant of exclusive jurisdiction to the USOC over all matters pertaining to the United States participation in the Olympic Games." *Slaney*, 244 F.3d at 595.

So too with the SafeSport Act and the eligibility decisions of the Center. *Slaney* assessed the Amateur Sports Act before the 2018 enactment of the SafeSport Act, which designated the Center as the independent organization with "jurisdiction over the corporation"—referring to the Olympic Committee—and over each national governing body "with regard to safeguarding amateur athletes against abuse, including emotional, physical, and sexual abuse." 36 U.S.C. § 220541(a)(1)(B). The Center's jurisdiction over the Olympic Committee on abuse allegations must, in turn, mean that eligibility determinations made by the Center—just like the Olympic Committee's determinations—generally cannot be questioned in federal court. Indeed, the SafeSport Act even more clearly extinguishes any notion of a private right of action under the statute: in the provision setting forth the Center's duties, the Act warns, "Nothing in this subsection shall be construed … to give rise to a claim under State law or to create a private right of action." § 220541(a)(2)(C). To drive the point home, the provision on "Limitation on liability" again instructs, "Nothing in this chapter shall be construed to create a private right of action." § 220541(d)(3)(B).

Having said that, the Seventh Circuit, in assessing the Amateur Sports Act on its own (before the SafeSport Act), recognized an exception to the general preemption of challenges to eligibility. "While there is no dispute that the USOC has exclusive jurisdiction when it comes to eligibility determinations, the courts can still play a role in ensuring that the organization follows its rules for determining eligibility." *Slaney*, 244 F.3d at 595. The Seventh Circuit relied on two district court cases holding that "contractual due process" claims that a national governing body had "contravened its own rules" were not preempted by the Act because those claims were not truly eligibility-determination disputes. *Id.* (citing *Foschi v. United States Swimming, Inc.*, 916 F. Supp. 232, 237 (E.D.N.Y. 1996); *Harding v. United States Figure Skating Ass'n*, 851 F. Supp. 1476, 1479 (D. Or. 1994)). But even the courts in those cases "cautioned that courts should rightly hesitate before intervening in disciplinary hearings held by private associations," acknowledging that it was only proper in unique circumstances where imminent, serious irreparable harm will result to the plaintiff and the "plaintiff has exhausted all internal remedies." *Slaney*, 244 F.3d at 595 (cleaned up).

The question here, then, is whether Dames' claims are "tort claims in name only," *Sanderson v. United States Ctr. for SafeSport, Inc.*, 2021 WL 3206322, at *4 (D. Colo. July 29, 2021), that in reality challenge the methods by which the Center determines the eligibility of coaches (preempted), or whether the claims solely assert that the Center has breached its own rules (not preempted). Dames argues for the latter, contending that the Center's Code of Conduct violates what he calls the "statutory due process protections" in the Amateur Sports Act and the SafeSport Act, and

13

do not require examination into the merits of the eligibility determination. Pl.'s Reply at 9–10.

But Dames' own complaint shows otherwise: it levels no allegations that the Center has violated its own *internal* rules,[5] and the substance of his allegations on the purported violations of the SafeSport Act in actuality challenge the Center's decision-making authority on eligibility. In particular, he complains that "none of the alleged conduct occurred [a]fter SafeSport was granted the authority to investigate this conduct," and that the Center has not identified a policy to apply to the allegations, but has "refused to dismiss th[ese] allegation[s] from its investigation," which has "impede[d] his ability to have USSF lift its suspension of his coaching license." Compl. ¶¶ 62, 65, 67, 78. None of that accuses the Center of violating its own rules.

On tortious interference, Dames alleges that the Center's investigation is interfering with USSF's reinstatement of his coaching license and preventing him earning a living. Compl. ¶¶ 88–89, 95. Still no allegation of the Center violating its own rules. And Dames' specific allegations on a violation of due process under the Amateur Sports Act and the SafeSport Act are premised on his contention that the Center cannot investigate conduct predating 2018 retroactively, *see id.* ¶¶ 1, 68–69, 82–83— which amounts to a challenge as to what the Center may consider when making its eligibility determinations. Again, that is not a contention that the Center has violated

---

[5]Although Dames' reply brief argues that he is challenging the Center's violation of its *own* rules, he simultaneously argues that the Center's rules violate federal law. *See* Pl.'s Reply at 8–10. But those are not the same thing, and his complaint confirms that he advances no claim that the Center breached its *own* internal procedures. *See generally* Compl.

14

its own rules. So the tortious-interference claims and the "statutory" due process claim under the Acts are preempted. Dames must arbitrate them through the process provided by the Center.[6]

### C. Futility

Lastly, Dames argues that it would be futile for him to challenge the Center's rules in arbitration because the Center's own code "does not empower arbitrators to determine whether SafeSport's investigation of Dames violates the jurisdiction Congress granted it, nor whether the SafeSport Code and procedures conflict with the due process protections of the Acts." Pl.'s Reply at 16. In support, he points out that the arbitrator in another case "concluded that he lacked the authority or jurisdiction under the Code to address that issue." *Navarro*, 2025 WL 209166, at *4.[7] In response, the Center counters that Dames may present any argument in the arbitration, and then the arbitrators will decide whether the argument may (or may not) be considered in the arbitration. Def.'s Mot. at 10–11 (citing *Callaghan v. United States Ctr. for SafeSport*, 2018 WL 4107951, at *6 (M.D. Fla. Aug. 29, 2018)).

---

[6]It is not crystal clear what a post-arbitration proceeding in federal court would look like. There is presumably no federal private right of action under the SafeSport Act, § 220541(a)(2)(C), § 220541(d)(3)(B). Perhaps the Federal Arbitration Act would apply, 9 U.S.C. §§ 1 *et seq.*, along with its accompanying deference to the arbitration decision. But if the arbitrators refrain from addressing a claim that the Center's rules do not comply with the SafeSport Act, then there might be no deference on that point. There is no need to definitively decide this issue right now (and maybe not ever in this case).

[7]Dames' reply brief cites to a different part of the *Navarro* opinion, but the cited pages do not contain discussion of this issue. *See* Pl.'s Reply at 16–17 (citing *Navarro*, 2025 WL 209166, at *9–10).

15

Dames does seem to have the better of the argument on the permitted scope of the arbitration. The Center's Supplemental Rules do prevent challenges to the rules themselves from being considered in the arbitration: the rule labelled "Scope" says, "Challenges to, or complaints about, any organizational practices or procedures shall not be addressed and the arbitrator shall be limited to evaluating whether a Covered Individual violated the *Code* and, if so, the appropriate sanction." R. 1, Exh. C, Suppl. SafeSport Rules at R-2. This particular Supplemental Rule does appear to block Dames from challenging the rules themselves, because they presumably would be considered "organizational … procedures" of the Center. *Id.*

But there still is reason to doubt that Dames can go straight to federal court with this argument without first undergoing the arbitration, especially when the ultimate dispute over the allegations and their impact of his eligibility to coach is covered by the arbitration agreement. SafeSport Code at 30 ("Each Participant, by virtue of membership, affiliation, or participation … agrees to abide by and be subject to these Arbitration Rules as the sole and exclusive method of resolving any challenge to the Center's eligibility determination(s) or the Center's processes."). Dames has agreed—by joining USSF—to abide by the Center's rules for the arbitration, which includes the rule that limits the scope of the arbitration and prevents challenges to the Center's procedures. Arbitration is, at the very least, the first stop (and possibly the only stop) in resolving the ultimate dispute over eligibility.

Indeed, when exhaustion of administrative remedies is required, even federal-constitutional challenges to agency regulations must await the end of the

administrative proceeding before resorting to federal court. In those circumstances, the Seventh Circuit has held that the "exhaustion doctrine retains vitality even when the collateral judicial action challenges the constitutionality of the basic statute under which the agency functions, even though one frequently asserted reason for requiring exhaustion, … to give the agency an opportunity to avoid or correct error, is inapplicable because an agency will not ordinarily pass on the constitutionality of the statute under which it operates." *Rosenthal & Co. v. Bagley*, 581 F.3d 1258, 1260 (7th Cir. 1978); *see also Frey v. Commodity Exch. Auth.*, 547 F.2d 46, 49 (7th Cir. 1976) (applying the exhaustion doctrine even where the plaintiff claimed the denial of discovery deprived him of constitutional due process and the plaintiff sought to enjoin the administrative proceeding). The other key purpose of exhaustion retains vitality: the decision in the administrative process may obviate the need for federal-court review. *See Rosenthal*, 581 F.3d at 1261. Admittedly, the analogy is imperfect: there is an extra-special value in avoiding a decision on a *constitutional* issue, more so than avoiding a decision on the *statutory* objection that Dames advances against the Center's procedures. But the point remains the same: when exhaustion is required, a litigant cannot skip directly to federal court solely because the first-instance decision-making entity cannot address a particular question. This is especially so where—as here—the decision-making entity undoubtedly has jurisdiction over the ultimate dispute involving Dames' eligibility to coach. *See* SafeSport Code at 30.

  Even if Dames could challenge the Center's rules as inconsistent with the SafeSport Act before exhausting the arbitration route, the challenge is meritless. The

17

SafeSport Act requires that the Center's disciplinary investigations provide procedural due process to individuals under its jurisdiction. 36 U.S.C. § 220541(a)(1)(H)(i)–(v). Those requirements are: (1) written notice of the allegations; (2) a right to be represented by counsel or an advisor; (3) opportunity to be heard during the investigation; (4) a reasoned written decision if the Center finds a violation of its Code; and (5) the ability to challenge in a hearing or through an arbitration interim sanctions imposed by the Center. *Id.* Here, Dames' own complaint alleges facts to establish that the Center has complied the applicable requirements (no violation has been found yet, so the "reasoned written decision" requirement has not yet been triggered, *id.* § 220541(a)(1)(H)(iv)).

First, the Center provided Dames with three Notices of Allegations that specify the year (or range of years) that the alleged violations took place, the initials of the athletes' names that he is alleged to have abused, and the general nature of each allegation. *See* Compl. ¶¶ 43, 57, 64; Feb. 2022 Notice; Jan. 2025 Notice; Feb. 2025 Notice. More importantly, he was also given hundreds of pages of the recorded statements and complaints on which the Center is basing its investigation, and he was given time to provide a "response and any supplementary information." Compl. ¶¶ 71–72. He also was informed of his right to an advisor, which "may be any person, including an attorney, who is not otherwise a party or witness involved in the investigation or hearing." Jan. 2025 Notice at 6; Feb. 2025 Notice at 2. That advisor may accompany him "at any meeting or proceeding related to the investigation, hearing, and/or resolution process." Jan. 2025 Notice at 6; Feb. 2025 Notice at 2. He also has

18

an opportunity to be heard during the investigation: the Notices specify that the next step is an interview where he has an "opportunity to explain [his] side of the situation, provide any information [he] may have in response to the allegations, offer names of any relevant witnesses, and to ask any question [he] might have of the other involved parties or about this process." Jan. 2025 Notice at 5; Feb. 2025 Notice at 2. And in 2022, when the Center imposed temporary measures requiring that Dames be accompanied by an adult during his coaching and limit his contact with athletes, he was informed of his right to a "temporary measures hearing" to "contest the imposition of those measures," which he ultimately did not request. Feb. 2022 Notice at 3.[8] All of these due-process provisions afforded to Dames are also generally enshrined in the Center's rules. *See* SafeSport Code at 23, 25. So Dames' statutory due-process argument challenging the Center's procedures would fail on the merits, even if he could present them now rather than going through arbitration.

## IV. Conclusion

For the reasons discussed in this Opinion, the Center's motion to dismiss, R. 15, is granted. That means that Dames' motion for a preliminary injunction, R. 1,

---

[8]Dames argues that he was entitled to a pre-determination hearing "before any of [the Center's] findings and sanctions [were] made public." Pl.'s Reply at 11. But this is unsupported by the SafeSport Act itself, which clearly states that "[n]othing in this subsection shall be construed … to preclude the Center from imposing interim measures or sanctions on an individual before an opportunity for a hearing or arbitration." 36 U.S.C. § 220541(a)(2)(A). His argument focuses on the Amateur Sport Act's requirement that governing bodies "provide[] … coaches … with fair notice and an opportunity for a hearing … before declaring the individual ineligible to participate." Pl.'s Reply at 14 (citing 36 U.S.C. § 220522(8)). But that section applies to the governing bodies, whereas the SafeSport Act explicitly instructs that the *Center* need not provide a pre-determination hearing, § 220541(a)(2)(A)

19

is denied because he has no likelihood of success. Because Dames has not yet had a chance to amend the complaint, the dismissal is without prejudice to filing an amended complaint. It does not seem likely that Dames can fix the allegations to navigate around the preemption, but he can give it a try. The amended complaint, if filed, is due on May 21, 2025. If no amended complaint is filed, then the dismissal will become final and judgment will be entered.

ENTERED:

s/Edmond E. Chang
Honorable Edmond E. Chang
United States District Judge

DATE: May 7, 2025